**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X

CRAIG CHU,                                     :
                                  :   Civil Action No.
                 Plaintiff,      :
                                    :
             v.                     :   **COMPLAINT**
                                    :
THE CITY OF NEW YORK,             :   **Jury Trial Demanded**
                                    :
                 Defendant.     :
                                    :
---------------------------------------------------------X

Plaintiff Craig Chu ("Plaintiff" or "Mr. Chu"), by and through his attorneys, Wigdor LLP, as and for his Complaint against Defendant The City of New York ("Defendant," "NYC" or the "City"), alleges as follows:

## PRELIMINARY STATEMENT

1.     Mr. Chu's case presents one of the rare instances in employment cases where a member of the group of officials who decided not to promote and/or hire him into a new, higher position (in this case, Chief Actuary of the NYC Office of the Actuary) admitted to the Plaintiff personally that unlawful bias had entered into the decision to select someone else over Mr. Chu.

2.     In June 2022, the choice for a new Chief Actuary for the City came down to Mr. Chu, an Asian male who is openly gay, who had been working in the Office of the Actuary for several years and was already Deputy Chief Actuary, and an older white male solo accounting practitioner with no experience working for a public entity (much less the Office of the Actuary itself) and had not managed other people in more than a decade (and who, upon information and belief, is not LGBTQ).

3.      Several members of the selection committee told Mr. Chu that his excellent record with the Office of the Actuary as an employee for several years, along with his education, actuarial credentials, and management experience, among other factors, all made him a superior candidate, and his interview with members of the Boards of three City pension funds in June 2022 went very well.

4.      However, a couple of weeks later, in early July 2022, Mr. Chu was informed that the other candidate had been selected in a "very, very close" vote.  A trustee privy to the selection discussions intimated to Mr. Chu that, if not for his legally protected characteristics (e.g., being an openly gay Asian male), he would have been selected for the Chief Actuary position rather than the older, straight white male candidate with less qualification and fit for the job.

5.      This statement to Mr. Chu constituted an admission that discrimination on the basis of what he is (i.e., his race, LGBTQ status/sexual orientation, and age), rather than who he is (that is, his merits, experience and qualifications as a candidate), are what proved decisive in Mr. Chu's non-selection for the Chief Actuary position.

6.      This readily apparent, and admitted, discrimination illustrates why Asian New Yorkers are so poorly represented among the executive ranks in City government relative to their proportion of the City's population and, more importantly, their presence among the City's employees overall.

7.      Defendant's conduct therefore has violated Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.,* ("ADEA"), the New York

State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City

Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

8.      Plaintiff will file a Charge of Discrimination with the Equal Employment

Opportunity Commission, an administrative pre-requisite to filing an action under Title VII and

the ADEA and will amend this action to include claims under Title VII and the ADEA at the

appropriate time.

9.      Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon

the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice

requirements of this action.

10.      Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

11.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under

§ 1981.  The Court has supplemental jurisdiction over Plaintiff's related state and local law

claims pursuant to 28 U.S.C. § 1367(a).

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to this action, including certain of the

unlawful employment practices alleged herein, occurred in this district.

## PARTIES

13.      Plaintiff Craig Chu was a Deputy Chief Actuary with the New York City Office

of the Actuary (the "Office" or the "Agency").  He is a gay Asian man of Chinese heritage, 40

years old at the time of the original filing of this Complaint, and is a resident of the state of New

York.  Mr. Chu left his job with Defendant at the Office of the Actuary in or around September

2022.

      14.    At all relevant times, Defendant City of New York ("New York City") is and has

been a municipality in the State of New York.  Defendant City of New York employed Mr. Chu

in one of its departments, the Office of Actuary, operating at 255 Greenwich Street, Ninth Floor,

New York, NY 10007.  New York City was Mr. Chu's "employer" under all applicable statutes

and laws.

## FACTUAL ALLEGATIONS

## I.    MR. CHU'S CAREER AND EMPLOYMENT AT THE NYC OFFICE OF THE ACTUARY

      15.    Mr. Chu worked at the NYC Office of the Actuary (the "Office") for more than

five years from 2017 until September 2022 serving the City's five pension systems.  His last job

title was Deputy Chief Actuary.  Mr. Chu received his Bachelor's degree in Applied and

Computational Mathematics from CalTech in 2004.

      16.    After college, his work experience includes but is not limited to many years

working at top accounting firm PricewaterhouseCoopers, on certain esoteric actuarial topics such

as variable benefits, which are rare and apply within New York City.  Mr. Chu has significant

experience in actuarial software development and has performed and managed actuarial

valuations for large and small pension plans.  He also has extensive experience and responsibility

for reviewing pension and post-retirement accounting for compliance and optimization under

U.S. and international accounting standards and requirements.

      17.    Mr. Chu's job performance for the City was, by all accounts, strong throughout

his employment, and he has been tasked and trusted with tackling and resolving many of the

Office's thorniest projects and problems.  Moreover, he has substantial and uniquely qualifying experience managing other employees within a public sector workforce.

18.     From July 1, 2021 through the end of his employment, Mr. Chu was Deputy Chief Actuary with the Office, and reported to the Chief Actuary, who serves as the Office's head.  The previous Chief Actuary, Sherry Chan, resigned in January 2022.  Although Ms. Chan is of Asian background, she was appointed Chief Actuary in the spring of 2015, when the only other finalist candidate dropped out of consideration, essentially leading to her appointment by default.

19.     In choosing to go to work for the City, Mr. Chu hoped and believed that he would find a diverse and diversity-friendly workplace that offered a merit-based path to advancement.

20.     This was the New York City government, after all, and its actuarial function no less (which should be very analytical and objective in evaluating a person's merits).  He thought that an actuarial agency would be very likely to be devoted to objectivity in performance and recognition, with its focus on calculations and numbers (i.e., whether they get the results needed to keep the pension funds solvent and secure, and do so accurately and safely, rather than engaging in arbitrary and biased decision-making)?

21.     Unfortunately, although Mr. Chu received much praise for his credentials, work product, personnel management experience, and track record with the City when he submitted his application for the Chief Actuary position in 2022, these legitimate factors were not what ultimately drove the Defendant's selection decision.

22.     Instead, the racial and other biases of members of the selection committee led them to select the older, white male finalist candidate, despite the clear imbalance of qualifications and fit that heavily favored Mr. Chu.

II.     **ADMITTED UNLAWFUL DISCRIMINATION AGAINST MR. CHU IN THE SELECTION OF A NEW CHIEF ACTUARY**

23.     After the resignation of the Chief Actuary in early 2022, three Boards of Trustees (NYC Employees' Retirement System, Teachers' Retirement System, and the Board of Education Retirement System) with authority over the Office that are tasked with the selection and appointment of a new Chief Actuary took steps to fill the vacancy.

24.     The existing First Deputy Chief Actuary stepped in to temporarily fill the job in an "Interim" or "Acting" capacity in the meantime.  In or around January or February 2022, a selection committee (the "Committee") was appointed by those Boards with representatives from each of the relevant Boards, most of whom were labor trustees on the pension boards.  The Committee chose a recruiter to help with the search and took other steps to find and vet candidates.

25.     In or around May 2022, the job posting for the Chief Actuary position became public.  Mr. Chu submitted his resume for the position in the normal course.  Mr. Chu was interviewed via Zoom during the first round of the selection process, and he was chosen to move on to a second round in-person interview as a "finalist" for the Chief Actuary position.

26.     On June 21, 2022, Mr. Chu and the other finalist, an older white male, were interviewed by the Committee in person.  The interview was with the full 14 or 15 members of the Committee.  Mr. Chu's interview seemed to have gone very well, with various Committee members, saying they were impressed with his credentials, answers, and/or ideas.

27.     After the interview, Mr. Chu heard that the Committee's members had said among themselves that his interview was "so good" that Mr. Chu should teach "master classes on how to interview."

28.     On or around June 27, 2022, the Committee held a deliberation session regarding the position.  On or around the days of June 27 to 30, the Boards held special sessions and voted to extend a job offer for the Chief Actuary position to the other finalist candidate.  Upon information and belief, detailed notes were taken at the relevant meetings.

29.     Mr. Chu was informed of the decision by a member of the Committee in person on June 30.  During this conversation, this person told Mr. Chu that they wanted to emphasize that the Boards were "so, so impressed with you [Mr. Chu,]" and that they hoped he would stick around and continue to "bless" the City with his expertise.  In addition, they mentioned that the appointed Chief Actuary "won't be around forever" and that "You [Mr. Chu] are still young." Mr. Chu was shell-shocked.

30.     Later that week, on or around July 1, another trustee called Mr. Chu.  In a telephone conversation, the trustee told Mr. Chu that he knew that the decision "must be heart-breaking," and that the full Boards knew that he was eminently qualified.

31.     The trustee also confided in Mr. Chu that "certain intangibles get factored in," including that Mr. Chu has a "long career ahead of [him.]"  The trustee mentioned that there was the possibility that the position would re-open in the future, and that the decision was "by no means a slam dunk" and was "very, very close."

32.     On July 5, 2022, Mr. Chu also spoke with a person with intimate knowledge of and who had observed the interview process.  They expressed their sincere condolences and sympathy that Mr. Chu had been passed over.

33.     Mr. Chu, searching for a reason the decision had gone the way that it had despite all that he had been led to believe, expressed a wish that perhaps he could have tweaked one

answer during the interview.  The person he was talking with told him that nothing like that had

been a factor, much less the deciding factor, in the selection decision.

34.     Instead, this person told Mr. Chu, "No, Craig, don't beat yourself up.  These

things are political, and I don't know if this was ever winnable on the merits."

35.     During later conversations of a personal nature with the trustee who talked with

Mr. Chu on July 1, the trustee admitted to him that, "I probably shouldn't say this, the vote was

very very close, but some people said that they were just more comfortable with Marek

[Tyszkiewicz].  They should probably do some introspection as to why that is."

36.     The person unambiguously intimated to Mr. Chu that, based on the Boards'

deliberations, that Mr. Chu's non-selection was due to his immutable characteristics

(specifically, his LGBTQ+ status and race and/or ethnicity), and that based on those unlawful,

discriminatory factors it was unlikely and improbable that he would ever have been chosen for

the Chief Actuary positions by the Boards' members.

37.     Indeed, Mr. Chu had mentioned his husband to the Board members, and this in

particular seems to have discomfited certain members of the Boards.  Mr. Chu being gay, a

younger person, and/or Asian was too much of an obstacle to be overcome with a certain

contingent, however impressive he was to the Committee and familiar he was with the workings

and mission of the Office.

38.     In early October 2022, Mr. Chu also spoke with a former coworker at the Office

of the Actuary who had close relationships with certain Board trustees and had clearly spoken

with them since the Chief Actuary hiring decision was made.  The person noted that the problem

with Mr. Chu as a candidate was that "You [Mr. Chu] reminded them too much of Sherry [Chan,

former Chief Actuary, who left in January 2022]."  Aside from being relatively young (i.e., in

her thirties) and of Asian descent, there is almost no similarity in qualifications nor work experience between Mr. Chu in mid-2022 and Ms. Chan at the time of her hire in 2015.  For example, Ms. Chan had never worked in New York much less for New York City itself, and also at the time of her hire did not hold an "Enrolled Actuary" ("EA") credential recognized by the IRS for certain compliance requirements, nor did she hold the credential of Fellow of the Society of Actuaries ("FSA").

39.     Marek Tyszkiewicz, the man chosen as Chief Actuary by the Boards rather than Mr. Chu, is a white male and a solo practitioner from Ohio who has not held a position managing a substantial workforce in several years, let alone one managing employees in the public sector, which presents distinct and often challenging issues concerning Civil Service law, collective bargaining contracts, and related detailed practices and precedent.

40.     The Office has approximately 40 employees, and there are substantial procedural, cultural, and policy aspects that an outsider will need very significant time to learn while trying to manage risk for the City's five major pension systems.  The recognition that Mr. Chu's knowledge and expertise regarding the City's pension systems and the Office itself was indispensable (it is not an exaggeration that Mr. Chu was begged to stay, lest the Office be in a very difficult spot without suitably experienced leadership at the top) only makes the discriminatory nature of the hiring decision more plain.

41.     It was repeatedly admitted by City officials that Mr. Chu's qualifications for the job were far superior to those of Mr. Tyszkiewicz (who had no familiarity at all with the City's systems or the Office of the Actuary).

42.     Moreover, Mr. Tyszkiewicz does not hold an "Enrolled Actuary" ("EA") credential recognized by the IRS for certain compliance requirements, a previously stated

requirement to be considered for the Chief Actuary position, nor does he hold the credential of Fellow of the Society of Actuaries ("FSA"), which supersedes the credential he holds of Associate of the Society of Actuaries ("ASA"), and an FSA credential is considered to be a stronger qualification.  Indeed, colleagues in public service actuarial work have stated that is highly questionable and even inappropriate for someone to hold such a high-ranking actuarial position without an EA credential.

43.     Numerous subordinates of Mr. Tyszkiewicz hold both these FSA and EA credentials, as does Mr. Chu himself.  Mr. Chu was the clearly stronger candidate (again, as acknowledged to Mr. Chu by multiple people with close knowledge of the selection process), including on the basis of his actuarial credentials, experience with a public sector workforce, etc.

44.     Mr. Chu's public service career suffered a serious and irreversible setback, and ultimately drove him to leave the Office due to the untenability of the situation, now that he had no choice but to raise this admitted discriminatory decision with the Office's officials, yet would otherwise have to report to the Mr. Tyszkiewicz, whose hiring he would be challenging.  This situation came about because of the longstanding and recognized biases of members of the Boards in question, which led to unlawful discrimination in the hiring decision for the Chief Actuary position.

45.     Mr. Chu has spent his professional life working with the belief that diligent competent work would be appropriately rewarded.  In title and prestige, he viewed the unique and reputational opportunity to serve as Chief Actuary of New York City as singularly prestigious, and the professional culmination of his career.  The distress of this biased and tainted decision-making process led Mr. Chu to leave active work in public service in September 2022 (with his official last day being October 21, 2022).  He expects that he will never work in public

service again after this experience.  Discussion of the stress and psychological impact of this

process has since dominated all discussions that Mr. Chu has with his ongoing mental health

provider.

46.     In addition to various professional and career consequences, Mr. Chu's annual

compensation would have been much higher as Chief Actuary, by as much as $100,000 to

$150,000 annually.  The salary currently paid to Marek Tyszkiewicz is $325,000. The private

sector position taken by Mr. Chu currently offers a base salary of $180,000.

## III.     THE CITY'S DISMAL RECORD OF ASIAN UNDERREPRESENTATION IN THE RANKS OF ITS UPPER MANAGEMENT

47.     Over the course of decades, the City has not made the hiring or advancement of

talented, hardworking Asian employees a priority.  Instead, the dearth of Asian employees and

their chronic underrepresentation in the upper ranks of its civil service positions has been ignored

and treated with indifference.

48.     Indeed, in the City's executive-level positions (i.e., Agency Commissioner and

Deputy Commissioner), Asian representation is nearly nonexistent.  Indeed, it is Plaintiff's

understanding that discovery in litigation would reveal that the number of Asian employees

promoted to executive positions in competitive situations within the public workforce of New

York City in recent years to be at or near zero.

49.     Mr. Chu being passed over for a lesser-qualified white and straight (or at least not

openly LGBTQ) candidate is only a very recent and privately acknowledged example of this

discriminatory marginalization.  Despite the City's efforts to hold itself out as a diverse employer

that is invested in workplace fairness and equity, the fact is that the City's upper ranks are

heavily occupied by white employees, with very few Asian executives.

50.     The overall number of Asian employees with the City is much more in line with their representation in the workforce, which serves to highlight the conspicuously low number of Asian individuals in upper management and executive-level positions, as Asian candidates are routinely passed over for promotion and consideration for elevation at far higher rates than white or other minority candidates.

51.     Therefore, due to this serious setback in his career and earning capacity due to unlawful animus, as well as the tremendous personal impact on him to learn that he was not selected due to admitted personal biases based on his protected characteristics, Mr. Chu seeks all available damages and tangible remedial action by the City.

**FIRST CAUSE OF ACTION**
**(Race and Ethnicity Discrimination under Section 1981**
***Against Defendant New York City***

52.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

53.     By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of Section 1981 by, *inter alia*, denying him the equal terms and conditions of employment because of his race and ethnicity.

54.     As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of damages.

55.     As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which he is entitled to an award of damages.

56.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Race, Ethnicity, Age, LGBTQ+ Status/Sexual Orientation Discrimination under NYSHRL)**
***Against Defendant New York City***

57.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

58.     By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYSHRL by, *inter alia*, denying him the equal terms and conditions of employment because of his race, ethnicity, age, and LGBTQ+ status/sexual orientation.

59.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

60.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which he is entitled to an award of monetary damages and other relief.

61.     Defendant's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

13

### THIRD CAUSE OF ACTION
**(Race, Ethnicity, Age, and LGBTQ+ Status/Sexual Orientation
Discrimination under NYCHRL)**
***Against Defendant New York City***

62.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

63.     By the actions detailed above, among others, Defendant has discriminated against Plaintiff in violation of the NYCHRL by, *inter alia*, denying him equal terms and conditions of employment because of his race, ethnicity, age, and LGBTQ+ status/sexual orientation, including but not limited to, failure to promote and/or hire him (and provide him with higher pay that would come with promotion).

64.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which he is entitled to an award of monetary damages and other relief, in addition to reasonable attorneys' fees and expenses.

65.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which he is entitled to an award of monetary damages and other relief.

66.     Defendant's unlawful and discriminatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.      An injunction and order permanently restraining Defendant and its officers, officials, agents, successors, employees and/or representatives, and any and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

D.      An award of damages against Defendant, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, as well as damage to his reputation, under applicable law;

E.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial;

F.      An award of punitive damages and any applicable penalties (including liquidated damages) in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and,

I.      Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: November 14, 2022
New York, New York                          Respectfully submitted,

                                            **WIGDOR LLP**


                                            By: _____
                                                Lawrence M. Pearson

                                            85 Fifth Avenue
                                            New York, NY 10003
                                            Telephone: (212) 257-6800
                                            Facsimile: (212) 257-6845
                                            lpearson@wigdorlaw.com


                                            *Counsel for Plaintiff*

16